Case number 17-6498, the Cincinnati Specialty Underwriters Insurance Company v. CFLP 1 LLC, Oral Argument Not to Exceed, 15 minutes per side. Derek Lamb for the appellant. You may proceed. Thank you. Your Honors, this is Lamb, and I think I mentioned in the footnote we're not related, even though we have the same last name. Unusual. It is unusual. This is a contract case, insurance contract. It's an Erie case, diversity of citizenship, which could set an important precedent for Kentucky and actually for other states regarding an alternative dispute mediation process known as appraisal, which, as I think I've explained in my brief, is voluntary for the insured. And I represent the respondent appellant, but actually in the shoes of the plaintiff because the insurance company took this case to the courthouse seeking to appoint an appraiser. And it could be a bad precedent in two or three ways. First of all, it will discourage the appraisal process because we received what would appear to be a biased appraiser and could not probe much into it. At least that's what we thought, and every appraiser they nominated to the court and allegedly prior to litigation was an insurance-oriented appraiser. Who would ever want to go into appraisal? It will discourage appraisal, and it's good for courts to have alternative dispute mediation. Secondly, it sets a precedent against what's called matching, which is a common remedy when the property that's insured, which is a building, not the specific board or shingle, is damaged and the cosmetic value of the entire building is damaged and you don't get matching, which you would see after storms as you drove around in Kentucky or arguably elsewhere throughout the country is these makeshod repairs like you see in the photographs in our exhibits. Is there any authority that indicates that you can get matching if it's an actual cash value policy and the matching would cost more than the actual value? I'll respond in two ways. First of all, that's an important question. If it's an actual cash value policy because... I'm not asking you to argue whether it is or isn't. I'm asking you, can you get matching if it's a cash value policy? I believe you can. I think you can. And what's the authority for that? Well, they've cited Couch. It'll take me about two sentences. They've cited Couch and we cite Couch for the opposite proposition. What the policy provides is in the four options, each one has the word property in it. Even the repair or replace option has the word property. And if you look at page 1070, it defines property to include building, not just siding or shingle. And in every case they cite and we cite about the same insurance policy provisions are there and it's always decided on the facts and no one is saying that actual cash value precludes matching. We pay for insurance coverage up to agreed policy limits for each building. Some may be actual cash value, some may be closer to replacement cost. But there's nothing in this policy which is to be construed, and I think the State Paul case is the Kentucky case on ambiguity, that this policy is to be construed against the insurance company. Maybe I don't understand this, but you've got these four options. The fourth one looks like a, quote, matching option because it talks about replace with other property of like, kind, and quality. That seems synonymous to me with matching. But the problem as I see it is these four options are separated by an or. And so I thought that left it with Cincinnati to decide how to do this. And what am I missing about that reading of the contract? You can have a contract where your client says we only want matching or we only want replacement value, but that's not the contract they signed. What am I missing? I'm glad to answer that question, Your Honor. First of all, the cases on that we cite. Well, no, just use the language. All right, I'll use the language. Don't do cases. What about the language am I missing? I'm glad to use language. Every one of those four options uses the word property. The question on matching is... Why wouldn't it use the word property? Because... I mean, they're not going to talk about law. They're going to say it's an insurance policy to deal with losses in property. So what does it mean that they all mention property? Let me answer the two-part sentence. They deliberately write these in an ambiguous way, but if you look at the definition of property, which I think is on page 1070 in the record, it includes buildings. And if buildings are the property, then the value of the buildings, which are the insured property, and the word property is in all four of those options, and there are cases I cite at page 23 of my reply brief and elsewhere. Forget the cases. Forget the cases. Keep going with the language. The property is the building, not just the boards. If the property is the boards, then all we have is the right to repair or replace the boards. What this court missed is, and there's national... This is the interpretation in Couch, which I cited, that the damaged property is the buildings. That's why you get matching. I just don't get your focus on property. Assume everything you're saying is correct about the property. The property is the building. The policy says the insurance company gets to choose which of these four options they utilize to pay, and one of those is to pay the value. So if matching costs more than the value, they obviously pick option one. If matching costs less, then they might pick one of the other options. What's wrong with that? Why am I wrong in that reading of section four of the policy? There's a simple answer to that. It doesn't just say repair or replace. In every one of those sentences, the word property is a necessary part of the equation. It always say repair or replace the property. That's not what option one says. Option one says pay the value of lost or damaged property. Property. The value of lost or damaged property, and the lost or damaged property is the building. Otherwise, because all... Your playing doesn't get you very far. I mean, property can just as easily refer to these shingles or whatever they are. That'd be under two. Maybe paragraph two is a better one. I'm not sure now I guess which one they chose. They all say the word property. Maybe just tell me if this is what you're trying to get at. Are you saying that if you had a bunch of broken windows in a building, they invoke this insurance policy? Are you saying the owner of the building that bought the policy gets to say, I know it's just broken windows, but we want the whole building replaced? Is that the point you're making when you emphasize the word building? No. Then I don't understand, in light of Judge Gibbons' question, what you're getting at. The problem is the windows are easy to replace. And when you can replace them, if you read the entire language of those four clauses, if you can provide a satisfactory remedy with replacement, that's fine. In this case, they don't make the kind of siding anymore that it would take to provide a cosmetically blending remedy. And in some of these cases, the building will not match a bond together without a complete replacement. I don't think, though, it's much as a remedy in siding. But if what you were saying is true, Your Honor, then – With windows, you could use any of the four options. You couldn't use any of the four options. You couldn't use it to get the remedy because you can achieve the replacement by just replacing the windows. There's no cosmetic issue on the windows unless there's some sort of unique windows with which I'm not familiar. I've never heard of a windows case in casualty insurance. You always have siding or shingles which no longer can be purchased on the market that match or which don't bond together with the rest of the siding or shingles and function as a single unit. That's why these cases – if what you're saying is true, sir, and I know you don't want me to cite precedent that all the cases I've cited across the country and even the district court recognized, you would not get a matching remedy ever. Replacement cost value or actual cash value because even the replacement cost cases all have those same four clauses. In fact, every case that the appellee cites has those four clauses. It's always a jury verdict which is being affirmed, and in this case, the appraiser is the juror. It's a judge and jury. What I asked the court to do was to instruct the appraiser about the law, and then the appraiser, who hopefully would be fair and neutral, would decide what remedy was appropriate. I'm not saying we're automatically entitled to anything. I just wanted a proper instruction to be given to a fair umpire, which is what's supposed to happen in appraisal. And we have appraisals, and the appraisal says, okay, in this case, I'm going to repair. It's just a window. In this case, I'm going to repair because we can replace this siding, and it will cosmetically blend. But in this case, I'm not going to do it, and if you look at the photos which we attach as exhibits, you can see what happens when they don't match. The property looks terrible, and they paid for a policy which has those four options. Now, I think I may have expressed what I'm trying to express. I do cite a lot of cases about it, but again, all four options use the word property, and this insurance policy defines... We got it. Okay, now, I'm going to make three other points. No, you're not. Your time is up. Well, do I have any rebuttal time? I don't know. I asked for five minutes. Yeah, you get your five minutes. I may briefly touch upon the other points, but I know we're here basically to answer the court's questions. I understand that. Thank you very much. Thank you. May it please the court, good morning, Your Honors. My name is Emily Lamb. I'm here on behalf of the Apelli Cincinnati Specialty Underwriters Insurance Company. Thank you all for the opportunity to address this court this morning regarding the claims and issues at stake in this case. This case involves what should have been from the outset a very simple, efficient process to resolve the dispute between CSU and Arcadia regarding the value of property damage that Arcadia sustained. Now, despite Arcadia's multiple unsuccessful efforts to kind of derail that process of the trial court below, the court sided with Cincinnati Specialty Underwriters in pretty much every respect, and after several years, the process was finally able to come to completion with the umpire's award. Now, what's important for this court to understand is that this process was fundamentally fair to Arcadia, and it worked. At the end of the day, Arcadia received everything that it was entitled to under the policy. Which one of the four options would you say your client invoked? I believe it was probably option two, which is the repair, the cost to repair or replace the lost or damaged property. Now, I know when my colleague was up here, there was a lot of focus on the word property. It's important to note that in those options, both one and two, the words lost or damaged qualifies property. There's nothing in any of those options that would speak to CSU's obligation to repair non-damaged portions of the property, and that's really what is at issue in this case. Out of curiosity, why don't people make it more clear? Your client gets the four options. Why not be more clear about which one you're choosing? It seems a little unfair to be insured to try to poke holes in every single option. Well, I believe it was clear to be insured. What happened was when the claim was processed, the Cincinnati Specialty Underwriters Adjusters went out. They evaluated the damage of the claim. They issued a check for the amount of the loss for the cost of what it would cost to repair or replace the damaged property. Arcadia was unsatisfied with that amount, so they had a dispute, which is how we ended up in the appraisal process, which the whole point of the appraisal process is to have a neutral, unbiased umpire come in. Was there an increase under number two? I'm sorry? Doesn't it go from basically $25,000 up to nearly $100,000? Am I remembering the numbers correctly? When the umpire came in, he did determine that the value of the damage was more than initially estimated by CSU, and so yes. What I'm asking is, was the umpire looking at number two? I believe the umpire was, yes. So both of them looked at number two, and that's a big difference, okay. It could have been number one. I believe it was number two. Matching is not part of two? Matching is not part of two. Matching is not part of any of these options under an actual cash value policy. And the umpire, you don't think, thought that either? No, the umpire did not think that. And the court specifically instructed the umpire in its orders that matching is not required under the policy. Why isn't it required under four? Why isn't four where it says replace with other property of like, kind, and quality? Am I misreading it? No, you're not misreading it. It simply means, for example, if a roof of a shingle, or excuse me, a shingle of a roof is damaged, the insurance company cannot come in and put a red shingle to replace what would have been a roof with remaining black shingles. The insurance company has to come in with a shingle of similar color and texture and quality as to what was there. It does not mean the entire roof gets replaced because there may be a slight color or texture difference. All that's required is comparable materials. So where does matching come in then? Matching doesn't come in at all in this actual cash value policy. I'm not asking under this policy. Does matching then, is that only a feature in the insurance world in connection with a replacement value policy? Yes, it is only in the replacement value policies. What Mr. Lamb seems to say, as I understand it, is these same four things apply in both replacement policies and actual cash value policies, so therefore matching must apply here. That is not correct. So the same four provisions do apply whether the policy is an actual cash value or a replacement cost policy. What the difference is, is the loss condition, which here in Section 7 of the policy does say it's actual cash value. Where it's replacement cost, you still have the same four options, but the way the loss is calculated can be higher. Essentially what a replacement cost policy does is it allows the insured the ability to profit from a loss, whereas an actual cash value policy takes into account what the fair market value of the property is at the time of the loss. In other words, what's the property's as-is condition when the loss occurs? These options to repair or replace under an actual cash value policy, as Judge Hale pointed out in the court below, would actually allow the insurer, in the case of an ACV policy, to pay less than actual cash value. If the cost to replace a window, for example, is less than the fair market value of the window, then the insurance company can actually pay less than ACV. But in a replacement cost policy... So what is the covered property then under this actual cash value policy under Section 7? The covered property is the building. That's how covered property is defined. So you and Mr. Lam agree that we're talking about the building here? I do agree with that. What I don't agree with is Mr. Lam's... So you're only willing to pay up to the value of the buildings, right? That would be the absolute... Regardless of what the cause of the loss was. That would be the absolute maximum, whatever the limit of insurance is for that building. There's 68 buildings here, if I understand it right. I believe that is correct. Somewhere in that neighborhood. And the appraiser said, or the umpire said, $94,000, I think. So essentially, then, he's saying that each one of these apartment buildings is only worth $1,500 or something like that? The damage to the siding, the value of the damage to the siding is only worth that certain amount. And the damage varied from building to building. There were some buildings that were more heavily damaged, some buildings that only sustained one or two hail dents. But that's where I'm still confused. Because you seem to be flipping back and forth between the value of the covered property, which is the building, that's what Mr. Lam is arguing, versus the cost of the repair, the damage, which is what you seem to be arguing. So the way the policy defines covered property is the building. However, when you look at the loss provision sections, the obligation to the insurer under Option 1 is to pay the actual cash value of the lost or damaged property. Not the undamaged property, the lost or damaged property. Likewise, under Section 2, Provision 2, it gives CSU the option to pay the cost of repairing or replacing the lost or damaged property. Again, those words lost or damaged qualify what the property is. There's nothing that would require CSU to essentially give Arcadia a windfall by rehauling all of the siding on the buildings. So covered property in 7, the valuation provision, means the buildings, but lost or damaged property in 4 means the siding. It means the damaged portions of the building, not the undamaged portions. In a way, I mean, you can think of property as the building, but you can also think of property as the various component parts of the building which are subject to repair under the policy if they are damaged. Exactly. Yes. And that is why there's nothing in the policy that obligates CSU to repair or replace components of the building, such as non-damaged portions of the siding, when there is no damage there to repair or replace. That would be a windfall to Arcadia, and that is why in the cases we've cited, the courts have said it's unreasonable, it's unduly burdensome to insurance companies, and it creates a windfall for insurers or insureds that they did not bargain for, particularly under these actual cash value policies where their recovery is limited to the fair market value of the property in its as-is condition at the time of the loss. So with the few minutes I have left, I want to talk about some of the other issues at stake in this appeal. The other big issue was Arcadia's motions to rescind the appraisal process and its allegations regarding bias of the umpire who was initially appointed. As to the motion to rescind, that motion was properly denied, and the court did not err when it allowed the appraisal process to continue. The appraisal process worked exactly as it should. The fact that CSU's appraiser and Arcadia's appraiser disagreed on who should be umpire is not grounds to rescind the process. That's why the appraisal process is there. It contemplates disagreement between the appraisers. At the end of the day, all CSU really cared about was having an umpire with the subject matter expertise, the education, the experience, the training, to be able to go in, independently evaluate this property, look at it, determine what the fair market value is, what damage was preexisting, because as we've cited in our briefs and into the lower court below, this had been a long-neglected property well before the hail storm. The siting was in extreme disrepair at the time of the hail storm. There was other damage to it that was not subject to this claim. So we needed an independent umpire to be able to go in there, evaluate the damage, the causation, the extent, and determine the loss. CSU nominated three umpires who it knew to have experience as umpires and doing appraisals. At the end of the day, the court reviewed those, chose Mr. Turley to serve as the umpire. Later on in the case, new allegations about Mr. Turley's bias were raised. The court questioned Mr. Turley, conducted a voir dire, found that those allegations of bias to be unfounded, and allowed the appraisal process to proceed. Now there is something in Arcadia's briefs that I want to point out because it's a misstatement of the facts and it's very important. In both of Arcadia's brief-in-chief and its reply brief, it has alleged that there's some kind of ownership relationship between CSU and NCA Group, which is a company that Mr. Turley was formerly affiliated with. That is not accurate. It's not at all accurate. They are not affiliated entities. There's no ownership relation between them. They are two separate, distinct entities. Mr. Turley formally owned his own claims-adjusting business that was bought out by NCA Group. For a period of time, Mr. Turley worked with NCA Group, but at the time of the appraisal in this case and his appointment as umpire, he had no employment or contractual affiliation with NCA Group whatsoever. As he confirmed to Judge Hale below, he did not consider CSU a client. NCA Group had no bearing on the assignments that he took. His compensation wasn't tied to how he was going to decide the cases in which he was umpire. He didn't get assignments from NCA Group, and he wasn't sure whether he'd even ever been involved in any other matter involving CSU. Absent of showing that there was some kind of significant ongoing relationship between Mr. Turley and CSU, the district court was correct in allowing him to retain his appointment as umpire and letting the umpire process finish out. The third and final issue to point on was the bad faith claim. It's CSU's position that the district court properly found that this bad faith claim failed as a matter of law and granted summary judgment in CSU favor. As the court is probably aware, under Kentucky law, a bad faith claim requires a showing that the insured was obligated to pay the claim and it was not fairly debatable. Here, all the evidence showed that all along up until the point of the umpire's award, the claim was fairly debatable. There was a huge debate over the amount of the claim. CSU was claiming that it was close to $30,000. Arcadia was claiming it was close to $1 million. In the face of that debate, CSU did exactly what it was supposed to do under the policy. It invoked the appraisal process. It attempted numerous times to move forward with the appraisal process. It appointed nominees for umpire who it believed had the requisite experience to handle the case. It also threw it open to the district judge to say, if you don't like any of our nominees, that's fine. Feel free to disregard them. All we want is somebody with the requisite subject matter expertise. At the end of the day, the umpire award finally went through. There was no evidence at any point below that CSU acted in bad faith. As such, the district court was correct when it found that there was no question of fact on this issue and it properly granted summary judgment to CSU on that claim. For the reasons I've stated, we ask that this court affirm the district court in all respects in finding that this is an actual cash value policy, in finding that because this is an actual cash value policy, there is nothing in the policy or in Kentucky law that would give Arcadia the right to cosmetic matching, in other words, a windfall. We ask that you affirm the summary judgment order dismissing the bad faith claim against CSU and we ask that you affirm the district court's decisions to move forward with the appraisal process as Mr. Jeff Turley is umpire. If there are no questions, I believe I have 30 seconds left, I will cede my time. Thank you all. Thank you. I would like to address... Could I ask you a couple questions? I'm trying to figure out what your position has been and what it is now in the context of what you think the district judge did wrong. So I'm on page 28 of your brief and you're summarizing now what the problem is here. The first thing you say is there's an ambiguity on the face of the policy as that it was a replacement cost value reimbursement policy. So your position now on appeal is this is a replacement policy. You seem to change that even, again, in your oral argument today. But the reason I'm asking you this question is it seems absolutely crystal clear that you conceded below that this was an actual cash value policy several times orally and in writing. So am I right about that or am I wrong about that? In all due respect, that's not what I said below. What I said was it's actual cash value up to the limits and you get replacement costs, a hybrid is what I said. I explained that well in my brief. So if I go back to your brief below, I'll find that? I cite it in my brief here where I cited it below. But there are other issues. So you say now, are you saying it's cash value or it's replacement or it's hybrid? What are you saying? I'm saying it's hybrid, although the replacement cost value box is checked. It's part of the reason for that argument. Okay. Then you want to say the district court should have ruled that Arcadia may have been entitled to a remedy of matching to be determined by the trier fact. So he was in error in saying no matching because it's not a replacement cost policy. He's in error either way. And he's in error also because I don't have to win the matching to win this case or appeal. And then lastly, although it's not in that page, you keep saying throughout these pleadings that you were entitled to a due process hearing. A hearing before whom about what and when. What does that mean? That got to the other point that I wanted to make. We filed four counts. One for rescission for material breach, cited cases across the country. And then when Mr. Turley was appointed, we showed that he had a relationship with the insurance company. We didn't find that out until afterwards. Mr. Lamb, you only got five minutes. You wanted a hearing before whom about what? I wanted a hearing before the judge on rescission. That's in pleading number 40. Okay. Now, did you not have a hearing before the judge? I heard no factual hearing, no evidentiary hearing. No, sir. No, Your Honor. Did you have oral argument? I had oral argument and it was decided on the facts. Did you ask at the oral argument that you needed an evidentiary hearing? I can't remember. It was in my pleading in about page 12 of pleading 40. Okay. I also asked for a jury trial on bad faith and unfair claim settlement practices. This may be the first Kentucky precedent. I showed a lot of reasons. All three of the appraisers they named, including Mr. Turley, had relationships with them. I was never allowed any discovery. We heard conversation. There was no evidence. I had some evidence. But there was a lot of challenge and question about Mr. Turley. They nominated three of three. The whole purpose of appraisal is to avoid a trial, and they forced us into this litigation. And one reason why that's important is that the district court's decision is completely missing it in this sense. They nominate who they want. You nominate who you want. And then do the two, one from them and one from you, then appoint the third? Is that how this works? We both nominate appraisers and the judge appoints the umpire. Okay. So he picks between your list and their list. And then instructs the umpire. I got that. Part of the instruction was that even if we lose on that. So you're saying that in every one of these you can say, oh, bad faith, and I rescind because you don't like who the other side nominates? Correct. They gave us no fair nominees, and the judge. That's in your view. Is there any case that supports that just because you don't like them, therefore there's bad faith? There's a tort of bad faith in Kentucky, and there is a statute on unfair claim settlement practices. And one of the issues is he is given the discretion to make a decision, even if it's actual cash value. Ma'am, this is pretty clear. Pretty succinct question, I thought. Is there a case that says that you can withdraw from appraisal and file a bad faith claim because you don't like who the other side nominates? In section one of my brief, I cited cases across the country where appraisal clause was considered to be materially breached. In some of those cases, there's Kentucky cases, the land handling might be one of them, where they gummed up the appraisal process by trying to control the umpire. All right. So I need to go back and read your section one. Section one of my brief. May I finish? Yes, Your Honor. I need to go back to section one and parse those cases to find, if any of them say what you say they say. Is that it? Yes. I argue material breach. Your time's up. I got it? Well, there's one point I kept trying to make. Well, you know, if judges ask you questions, your duty is to try to answer that question. You don't then get to take off the time that the judge spent asking you questions. I mean, we don't ask questions just for the fun of it. We ask questions because we're zeroing you in on what will help us decide the case. And the fact that you might have wanted to say something else at this point is. If that's the ruling, that's the ruling. Every one of those was related to the questions, though, that I was asking. Sometimes. I will. You have to cut the lawyers off because you can tell they're going to go on for another five or ten minutes if you let them. And if you're presiding, unless you are in the habit of letting the lawyers run the courtroom instead of you, you've got to say it's time's up. I was trying to put one sentence out, but I guess I don't get to do it. Thank you for both your arguments. We'll consider the case carefully. Thank you very much.